Chester SMITH, individually and on behalf of all others similarly situated, Merle Fisher, individually and on behalf of all others similarly situated, et al., Plaintiffs-counterdefendants-Appellants, Cross-Appellees,

v.

GTE CORPORATION, GTE South, Inc., Defendants-counterclaimants-Appellees, Cross-Appellants.

No. 99-12833.

United States Court of Appeals,

Eleventh Circuit.

Jan. 4, 2001.

Appeals from the United States District Court for the Middle District of Alabama. (No. 97-00102-CV-D-S), Ira De Ment, Judge.

Before CARNES and BARKETT, Circuit Judges, and POLLAK[*], District Judge.

CARNES, Circuit Judge:

In this putative class action suit, the plaintiffs assert various state law claims based on an alleged scheme by the defendants, GTE Corporation and GTE South, Inc. (collectively "GTE"), to defraud their customers into leasing telephones and paying exorbitant lease charges. GTE filed a motion to dismiss, contending that the Alabama Public Service Commission ("APSC"), which regulates public utilities operating in that state, has exclusive jurisdiction over the plaintiffs' claims. Alternatively, GTE argued APSC has primary jurisdiction over the claims and that the district court should abstain until the plaintiffs' claims were presented to and reviewed by the APSC. Relying on the primary jurisdiction doctrine, the district court concluded that the plaintiffs should first present their claims to the APSC and for that reason dismissed the suit without prejudice. The plaintiffs appealed.

We vacate the district court's order and remand with directions that the case be dismissed on the grounds that federal courts lack subject matter jurisdiction over this state law case because there is an insufficient amount in controversy for diversity jurisdiction to exist, and no federal law question in the complaint for federal question jurisdiction to exist.

## I. BACKGROUND

The origin of this lawsuit lies in the deregulation of "customer premises equipment" ("CPE"). GTE,[1]

---

[*]Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1]GTE Corporation is the holding company parent of GTE South, Inc., a local exchange carrier which provides telecommunications services to customers in Alabama, among other states.

in addition to providing telecommunications services, leases telephones and related equipment, collectively referred to as CPE, to some of its telecommunications services customers. Before 1988, the leasing activity of GTE and other telecommunications providers, including the amount of the lease rates, was subject to federal and state regulation. In the early 1980s, the Federal Communications Commission ("FCC") decided to deregulate the CPE activity of these providers, thereby allowing them to compete freely with other non-telecommunications providers in the market for CPE while the regulation of their telecommunications services continued.

As part of the deregulation plan, the FCC found it necessary to preempt state regulation of CPE activity, but it allowed states to develop their own deregulation plans provided that those plans were implemented by December 31, 1987. In the Matter of Procedures for Implementing the Detariffing of Customer Premises Equipment and Enhanced Services, 99 F.C.C.2d 354 (1984). Working with the telecommunications providers in Alabama, the APSC followed the directive of the FCC and achieved the deregulation of the providers' CPE activity before 1988.

In January of 1997, Chester Smith and three other Alabama residents filed this putative class action lawsuit against GTE. According to the plaintiffs, after its CPE activity had been deregulated, GTE offered to sell at "artificially high prices" phones that were then being leased by its customers. GTE allegedly treated a customer's lack of response to the offer as "an agreement to continue leasing," which the plaintiffs refer to as "an unlawful negative option." The plaintiffs further allege that during the "Deregulation Period"—which they define as January 2, 1988 until the present—GTE has carried out a "fraudulent scheme," which includes charging its customers exorbitant fees for leased telephones, concealing the existence and amount of those charges, failing to inform customers they would be better off purchasing phones from third parties, and in some instances, charging customers for phones that no longer worked or had been returned to GTE.[2]

In their amended complaint, the plaintiffs assert state law claims for fraud, unjust enrichment, breach of contract, and breach of warranty. In addition, the plaintiffs seek equitable relief in Count VI of their complaint, including an injunction preventing GTE from misrepresenting its lease charges on monthly bills

_____

[2]As an example of GTE's alleged deceptive nature of lease charges, the plaintiffs state that the charge for a leased phone was listed as "desk phone" under the heading of "local services" and then listed under the heading of "GTE Basic Service" in the monthly bills sent to customers, thereby implying that the charge was part of the regulated basic service and that non-payment for the charge would result in disconnection of the customer's phone service. They contend that not until October 1996 did GTE first use the word "rental" to refer to the lease charges.

and a declaration that the lease agreements for telephones are "null and void from their inception."

The plaintiffs contend that diversity jurisdiction exists over their state law claims, and they seek to certify the following two classes: (1) the "Damages Class," which consists of "all persons who presently reside in Alabama who have leased telephone equipment for residential use from [GTE] at any point in time between January 2, 1988 and the date of this suit," and (2) the "Injunctive Class," the composition of which is identical to the "Damages Class" except that it also includes residents of Kentucky, North Carolina, and Virginia. Although the complaint does not allege the number of members in each of the proposed classes, it does allege that "[i]n mid-1993 [GTE] leased telephone equipment to 36,065 residents of the state of Alabama." Consequently, the "Damages Class" alone consists of more than 36,000 members.

On August 14, 1997, GTE moved for judgment on the pleadings. In its motion, GTE argued that the APSC, which supervises and regulates public utilities in Alabama, had either exclusive or primary jurisdiction over the plaintiffs' claims. GTE requested that the district court dismiss the plaintiffs' suit and effectively require them to present their claims to the APSC. The motion was referred to the magistrate court who ultimately recommended that the district court, under the primary jurisdiction doctrine, stay the proceedings in the lawsuit until the plaintiffs' claims could be heard and decided by the APSC.[3]

Agreeing that the APSC should exercise primary jurisdiction over the plaintiffs' claims, the district court adopted the recommendation of the magistrate court except that it did not order a stay. Instead, the court dismissed the case without prejudice to allow the plaintiffs to "assert their claims before the APSC, with leave to any Party to move the court to reinstate the action on the active docket of the court, if and when appropriate and necessary." The plaintiffs appealed.

On appeal, we raised the question of whether this case involved a sufficient amount in controversy to establish federal diversity jurisdiction under 28 U.S.C. § 1332. The parties submitted supplemental briefing on that issue and addressed it at oral argument. Both the plaintiffs and GTE contend that there is a

---

[3]"Primary jurisdiction is a judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the actions by an administrative agency." *Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 201 (5th Cir.1988). Even though the court is authorized to adjudicate the claim before it, the primary jurisdiction doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (explaining that, like an exhaustion of remedies requirement, the primary jurisdiction doctrine "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties").

sufficient amount in controversy. However, we conclude that there is not, and that federal question jurisdiction also is not present, with the result that the district court lacked subject matter jurisdiction over the case.

## II. DISCUSSION

"Federal courts have limited subject matter jurisdiction, or in other words, they have the power to decide only certain types of cases." *Morrison v. Allstate Indem. Co.,* 228 F.3d 1255, 1260-61 (11th Cir.2000) (citing *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 409-10 (11th Cir.1999)). Lower federal courts can exercise this power only over cases for which there has been a congressional grant of jurisdiction, *see id.,* "[a]nd because the Constitution unambiguously confers this jurisdictional power to the sound discretion of Congress, federal courts should proceed with caution in construing constitutional and statutory provisions dealing with [their] jurisdiction." *University of South Alabama,* 168 F.3d at 409 (citations and internal marks omitted).

In this case, neither party has challenged federal court jurisdiction. However, because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises. *See Fitzgerald v. Seaboard Sys. R.R., Inc.,* 760 F.2d 1249, 1251 (11th Cir.1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *see also Morrison,* 228 F.3d at 1261-62 (raising *sua sponte* on appeal the issue of whether the case involved a sufficient amount in controversy for diversity jurisdiction); *Laughlin v. Kmart Corp.,* 50 F.3d 871, 873-74 (10th Cir.1995) (same).

In their complaint, the plaintiffs allege that diversity jurisdiction exists over this case, and neither the defendant nor the district court questioned that allegation.[4] Moreover, even after we raised the potential jurisdictional problem on appeal, both parties maintained in their supplemental briefs that federal jurisdiction exists over the case. But subject matter jurisdiction exists only where granted by statute, and thus, a federal court is not bound by the jurisdictional contentions of the parties. *See Morrison,* 228 F.3d at 1261; *Jackson*

_____

[4]When the plaintiffs filed their complaint, and when the district court dismissed the suit on the basis of primary jurisdiction doctrine, some precedent in this circuit appeared to indicate that a class claim for punitive damages could establish the requisite amount in controversy for diversity jurisdiction over a class action. *See infra* Part II.A. That may be the reason that no one questioned the district court's jurisdiction.

*v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1000-01 (11th Cir.1982) ("The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case and cannot be waived or otherwise conferred upon the court by the parties.").

While both parties argue in their supplemental briefs that this case involves a sufficient amount in controversy to sustain diversity jurisdiction, the plaintiffs also raise the possibility that the FCC's preemption of state regulation of CPE establishes federal question jurisdiction over their claims, pursuant to 28 U.S.C. § 1331. Because the plaintiffs originally premised jurisdiction on the diversity of citizenship, pursuant to 28 U.S.C. § 1332, and because the parties primarily focus on that basis for jurisdiction, we will address the issue of diversity jurisdiction first.

## A. DIVERSITY JURISDICTION

The foundation for federal court diversity jurisdiction—the power to decide cases between citizens of different states—is Article III of the United States Constitution. *See* U.S. Const. art. III, § 2. However, when Congress created lower federal courts, it limited their diversity jurisdiction to cases in which there was a minimum monetary amount in controversy between the parties. See *Snyder v. Harris,* 394 U.S. 332, 334, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969). Today, the threshold amount in controversy for diversity jurisdiction, excluding interests and costs, is $75,000. *See* 28 U.S.C. § 1332.

Regarding the amount in controversy requirement, the plaintiffs allege in their complaint the following: "Although the actual damages claimed by the named Plaintiffs are less than $75,000.00, Plaintiffs also claim punitive damages against [GTE]. Therefore, the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00."[5] In making this allegation, the plaintiffs appear to have relied on this Court's holding in *Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353 (11th Cir.1996), that a class claim for punitive damages under Alabama law could be viewed in the "aggregate" for amount in controversy purposes, which meant that the amount of punitive damages claimed could be attributed *in toto* to each member of the

---

[5]The compensatory, or actual, damages of the class members appear to be relatively small. According to the plaintiffs, the allegedly fraudulent and excessive lease rates charged by GTE ranged from $3 to $10 a month. Over a twelve year period (1988 to the present), the class members would have paid approximately between $440 and $1,400 in lease charges, well below the $75,000 required for diversity jurisdiction. Moreover, the compensatory damages claims, as well as the unjust enrichment claim, of the class members arise from each plaintiff's individual agreements with GTE, and thus, those claims may not be aggregated for amount in controversy purposes. *See Morrison,* 228 F.3d at 1263-64.

class in order to establish diversity jurisdiction over the claims of the entire class. *See id.* at 1358-59.[6]

However, after the district court in this case dismissed the plaintiffs' suit and they appealed, this Court decided *Cohen v. Office Depot, Inc.,* 204 F.3d 1069 (11th Cir.2000) ("*Cohen II* "). In *Cohen II,* we held that a prior panel decision by the Former Fifth Circuit, *Lindsey v. Alabama Tel. Co.,* 576 F.2d 593 (5th Cir.1978),[7] precluded aggregating punitive damages to establish diversity jurisdiction over a class action, and that decision is to be followed notwithstanding a contrary holding by the subsequent panel in *Tapscott. See Cohen II,* 204 F.3d at 1073-77.[8]

In light of *Cohen II* and *Lindsey,* which require that any class claim for punitive damages under Alabama law be divided *pro rata* among all of the class members for amount in controversy purposes, we put to the parties the question of whether the present case involves a sufficient amount in controversy for purposes of diversity jurisdiction. They responded that, despite the decisions in *Cohen II* and *Lindsey,*

---

[6]Generally, when plaintiffs join in one lawsuit, the value of their claims may not be added together, or "aggregated," to satisfy the amount in controversy requirement for diversity jurisdiction. *See Zahn v. International Paper Co.,* 414 U.S. 291, 295, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1974); *Snyder,* 394 U.S. at 335, 89 S.Ct. at 1056. However, "when several plaintiffs unite to enforce a single title or right, in which they have a *common and undivided interest,* it is enough if their interests collectively equal the jurisdictional amount." *Zahn,* 414 U.S. at 294, 94 S.Ct. at 508 (distinguishing between the "common and undivided" interest, for which aggregation is permissible, and "separate and distinct" interests, for which aggregation is not permissible) (emphasis added) (quoting *Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.,* 222 U.S. 39, 40-41, 32 S.Ct. 9, 56 L.Ed. 81 (1911)).

[7]Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on this Court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

[8]Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court. *See Cargill v. Turpin,* 120 F.3d 1366, 1386 (11th Cir.1997).

In the initial panel decision in *Cohen v. Office Depot, Inc.,* 184 F.3d 1292 (11th Cir.1999) ("*Cohen I* ") this Court reversed the district court's order of dismissal for lack of subject matter jurisdiction. In that case, after the district court had stricken the Florida plaintiffs' punitive damage claim because it had not been properly pled in accordance with Fla. Stat. § 768.72, the court concluded that the plaintiff's class action suit did not satisfy the amount in controversy requirement. *See id.* at 1294. On appeal, the Court held in *Cohen I* that Fla. Stat. § 768.72 did not apply to cases filed in federal court, *see id.* at 1295-99, and relying on *Tapscott,* concluded that the punitive damages claim could be aggregated to satisfy the amount in controversy requirement for diversity jurisdiction. *See id.* at 1295.

The defendants in *Cohen* filed a petition for rehearing in which the *Lindsey* decision was "belatedly" brought to the Court's attention. *See Cohen II,* 204 F.3d at 1072. Concluding that *Lindsey* was controlling on the punitive damages issue under our prior panel precedent rule, we held in *Cohen II* that the punitive damages claim could not be aggregated, and we affirmed the district court's dismissal for lack of subject matter jurisdiction. *See Cohen II,* 204 F.3d at 1073-77, 83.

punitive damages may still be viewed in the aggregate to satisfy the requisite amount in controversy. In addition, the plaintiffs contend that their claim for attorney's fees and the value of the requested injunctive relief may be viewed in the aggregate, thereby providing additional bases for establishing a sufficient amount in controversy. We address their contentions in that order.

1. *Punitive Damages*

In arguing that *Tapscott* continues to be controlling authority on the issue of aggregating a class claim for punitive damages, the parties primarily rehash the same arguments considered and rejected by this Court in *Cohen II.* They maintain that no conflict exists between *Lindsey* and *Tapscott* because the *Lindsey* Court did not address the same issue as the *Tapscott* Court—whether class members have a "common and undivided interest" in a claim for punitive damages under Alabama law, thereby permitting a class claim for punitive damages to be viewed in the aggregate for amount in controversy purposes. *See Snyder,* 394 U.S. at 335, 89 S.Ct. at 1056; *see also Zahn v. International Paper Co.,* 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1974) (explaining that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest," their claims may be viewed in the aggregate to satisfy the amount in controversy requirement) (citations omitted).

According to the parties, the *Lindsey* Court simply assumed that punitive damages could not be viewed in the aggregate under the Supreme Court's decision in *Snyder,* and failed to consider the "common and undivided interest" exception to the general rule prohibiting aggregation acknowledged by the Supreme Court in *Snyder,* as well as in its later decision in *Zahn.* Because the *Tapscott* Court subsequently concluded that Alabama plaintiffs do have a common and undivided interest in a class claim for punitive damages, the plaintiffs contend that holding from *Tapscott* is the controlling law on the issue of whether such damages can be viewed in the aggregate. We rejected that very contention in *Cohen II,* 204 F.3d at 1075, and we are bound by *Cohen II* to reject it again here.

Recently, in *H&D Tire and Automotive-Hardware, Inc. v. Pitney Bowes, Inc.,* 227 F.3d 326, 329-30 (5th Cir.2000), the Fifth Circuit addressed a similar conflict between *Lindsey* and the subsequent panel decision in *Allen v. R&H Oil & Gas Co.,* 63 F.3d 1326, 1329 (5th Cir.1995). Concluding that the result in *Lindsey* implicitly requires that a class claim for punitive damages be distributed *pro rata* among the class members for amount in controversy purposes, which is the same conclusion we reached in *Cohen II,* the Fifth Circuit in *Pitney Bowes* adhered to the prior panel precedent rule and held that a class claim for punitive

damages could not be viewed in the aggregate to satisfy the requisite amount in controversy. *See id.* In other words, the Fifth Circuit in *Pitney Bowes* reached the same conclusion about *Lindsey* that we did: *Lindsey* establishes binding circuit law against aggregation of punitive damages for amount in controversy purposes.

Like the plaintiff in *Cohen II,* the parties in this case are arguing simply that the decision in *Lindsey* was wrong because, according to them, class members have a "common and undivided interest" in a class claim for punitive damages. *See Cohen II,* 204 F.3d at 1076. But "[e]ven if we thought *Lindsey* wrong, the prior panel precedent rule is not dependent upon a subsequent panel's appraisal of the initial decision's correctness." *Id.; see also United States v. Steele,* 147 F.3d 1316, 1317-18 (11th Cir.1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.") (citations omitted). Simply put, *Lindsey* precludes viewing a punitive damages claim in the aggregate for amount in controversy purposes, and because that panel was the first in this Circuit to address the issue, *Lindsey* is the law of this Circuit. *See Cohen II,* 204 F.3d at 1076-77; *see also Pitney Bowes,* 227 F.3d at 330 ("Because *Lindsey* is the earliest, and thus controlling, decision in this circuit, the punitive damages claims of the putative class cannot be aggregated and attributed to each plaintiff to meet the jurisdictional requirement.").[9]

Going beyond their argument that no conflict exists between *Lindsey* and *Tapscott,* the parties contend that even if there is such a conflict, an exception to the prior panel precedent rule exists where the first panel to address an issue failed to follow and apply controlling Supreme Court precedent. In support of this contention, GTE points to *Tucker v. Phyfer,* 819 F.2d 1030 (11th Cir.1987), in which the panel expressly reached a holding contrary to that of a previous panel. *See id.* at 1035 n. 7. In doing so, the *Tucker* Court noted that the prior panel had not referred to two Supreme Court cases that it thought compelled a different result. *See id.* Declining to follow the prior panel's holding, the *Tucker* Court opined that if the two Supreme Court decisions had "been called to the attention of the [prior] panel, the panel would have come to the conclusion we reach today." *Id.*

---

[9]The plaintiffs point out that the *Tapscott* Court, in considering the nature of punitive damages under Alabama law and concluding that the class members had a common and undivided interest in those damages, relied on Alabama Supreme Court cases that were decided after *Lindsey.* But there is no indication in *Lindsey* that the Court based its decision on the particular nature of Alabama punitive damages. *See Pitney Bowes,* 227 F.3d at 329 ("*Lindsey* 's reasoning did not rely on a characterization of punitive damages under Alabama law...."). Thus, there is no basis for concluding that the subsequent Alabama decisions relied on by *Tapscott,* or any subsequent Alabama decision addressing punitive damages issues, have undermined or "overruled" *Lindsey.*

The parties contend that the "exception" to the prior panel precedent rule recognized in *Tucker* applies here and prevents *Lindsey* from binding subsequent panels on the issue of aggregating punitive damages. Because the *Lindsey* Court did not discuss the general aggregation standard noted in *Snyder,* which allows aggregation of the claims of multiple plaintiffs to satisfy the amount in controversy requirement when the plaintiffs assert a "single title or right in which they have a common and undivided interest," *Snyder,* 394 U.S. at 335, 89 S.Ct. at 1056, the parties argue that the *Lindsey* Court failed to follow the Supreme Court's decision in *Snyder,* and thus, that this Court's subsequent decision in *Tapscott* controls. That position is wrong from the beginning. In explaining why, we will start with the supposed exception to the prior panel precedent rule.

If such an "exception" truly existed, it could end up nullifying the well-established prior panel precedent rule that is an essential part of the governing law of this Circuit. *See* Phillip M. Kannan, *The Precedential Force of Panel Law,* 76 Marq. L.Rev. 755, 763 (1993) (noting a similar exception to the prior panel precedent rule for "serious or egregious errors" by the prior panel and explaining that such an exception "is a prescription for rule-swallowing if ever there was one"). To the extent *Tucker* supports such an exception, it is itself inconsistent with prior precedent. In *United States v. Bascaro,* 742 F.2d 1335, 1343 (11th Cir.1984), which preceded *Tucker,* we emphatically held that "the mere act of proffering additional reasons not expressly considered previously ... will not open the door to reconsideration of the question by a second panel." *Bascaro* involved an issue of statutory interpretation, but there is no principled basis for distinguishing between that and the interpretation of governing decisions.

Moreover, if there ever was an exception to the prior panel precedent rule such as that expressed in *Tucker,* it did not survive the pronouncement of the en banc Court in *United States v. Steele,* 147 F.3d 1316 (11th Cir.1998) (en banc), that: "Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong." *Id.* at 1317-18.

The idea of an exception to the prior panel precedent rule where a subsequent panel is convinced the prior one reached the wrong result—for whatever reason—is also inconsistent with a number of decisions in which panels of this Court have obediently followed prior panel precedents they were convinced were wrong. *See, e.g., In re Dickerson,* 222 F.3d 924, 926 (11th Cir.2000)(following the holding of an earlier panel decision even though "were we to decide this issue on a clean slate, we would not so hold."); *United States v. Steele,* 117 F.3d 1231, 1234-35 (11th Cir.1997) (reluctantly following a prior panel decision even

though convinced it conflicted with the plain language of the statute in question);[10] *Turecamo of Savannah, Inc. v. United States,* 36 F.3d 1083, 1087 (11th Cir.1994) (following precedent thought to be wrong even though the prior panel apparently overlooked important legislative history that would have led to a different result); *see also Wascura v. Carver,* 169 F.3d 683, 687 (11th Cir.1999)(responding to the argument that the reasoning of a prior panel decision "is unclear and inadequate to support its holding" by stating that "[w]e have no occasion to pass on that criticism, because we are bound by the [prior panel] decision regardless of whether we agree with it.").

Permitting an "overlooked reason" exception would undermine the values of stability and predictability in the law that the prior panel precedent rule promotes. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209-10 (11th Cir.1981) (en banc); *see also Jaffree v. Wallace,* 705 F.2d 1526, 1533 (11th Cir.1983)("Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability."). For all of these reasons, we categorically reject any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time.[11]

Even if the *Tucker* exception were engrafted onto the controlling law of this circuit—instead of being rejected by it—that would do these parties no good. In both *Snyder* and *Zahn,* the Supreme Court rejected attempts to aggregate claims of class members, and there is no intimation in either of those decisions that members of a class have a common and undivided interest in a class claim for punitive damages that would permit aggregating that claim. Thus, unlike the situation in *Tucker,* there was no "clearly controlling Supreme Court precedent" on the issue of aggregating punitive damages when *Lindsey* was decided. *See Tucker,* 819 F.2d at 1036 n. 7.

---

[10]The erroneous result reached by the prior panel whose decision bound the *Steele* panel was corrected en banc, *United States v. Steele,* 147 F.3d 1316 (11th Cir.1998) (en banc), which is how erroneous panel decisions should be corrected. *See id.* at 1318. Before changing circuit law, as it had the authority to do, the en banc court in *Steele* recognized that the panel in that case had been bound to follow the prior panel decision even though it was wrong. *See id.* at 1317 (the panel reached the result it did "because it was bound to do so by the prior panel decision," but "[b]ecause we are sitting en banc, we are not bound by the [prior panel] decision.").

[11]Our use of the limiting phrase "as it relates to the law in existence at that time" is deliberate. Subsequent panels are not bound by prior decisions where there has been a change in the controlling law as a result of a subsequent en banc or Supreme Court decision or statutory change. *See United States v. Hanna,* 153 F.3d 1286, 1288 (11th Cir.1998)("In this circuit, only the court of appeals sitting *en banc,* an overriding United States Supreme Court decision, or a change in the statutory law can overrule a previous panel decision.").

Moreover, in attempting to justify the exception in *Tucker,* the panel in that case noted that the prior panel whose decision it questioned had failed to mention either of the two controlling Supreme Court decisions. *See id.* That was critical to the *Tucker* panel, which said: "We hasten to add that had the [prior] panel expressly considered [the two controlling Supreme Court decisions], we would be bound by its interpretation and application of those decisions." *Id.* By contrast, the *Lindsey* Court cited *Snyder* for the proposition that the claims of class members may not be aggregated to satisfy the amount in controversy requirement, and it also cited the Supreme Court's subsequent decision in *Zahn. See Lindsey,* 576 F.2d at 594 (citations omitted). These citations indicate that the *Lindsey* Court was well aware of the "common and undivided interest" standard for aggregation acknowledged in *Snyder* and *Zahn* but that it construed *Snyder* to preclude aggregation of a class claim for punitive damages. So, even if the *Tucker* exception were viable, it would have no application here.

As recently noted by the Fifth Circuit, "*Lindsey* 's reasoning did not rely on a characterization of punitive damages under Alabama law, but was instead based on the principle that 'the claims of several plaintiffs, suing as members of a class, cannot be aggregated for the purpose of satisfying th[e] jurisdictional predicate.' " *Pitney Bowes,* 227 F.3d at 329 (quoting *Lindsey,* 576 F.2d at 594) (citing *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)); *see also Ard v. Transcontinental Gas Pipe Line Corp.,* 138 F.3d 596, 601 (5th Cir.1998) ("*Lindsey* therefore applies *Snyder* 's reasoning that compensatory damage claims cannot be aggregated for jurisdictional purposes to the context of punitive damage claims."). The fact that the *Lindsey* Court did not explicitly say "there is no common and undivided interest in a class claim for punitive damages" does not undermine the clear reasoning and result of that decision nor does it vitiate the resulting rule.

In summary, the parties' alternative argument boils down to the position that *Lindsey* incorrectly interpreted and applied *Snyder* because, as the parties contend, class members have a common and undivided interest in a claim for punitive damages. The prior panel precedent rule clearly forecloses their position. *See Cohen II,* 204 F.3d at 1076; *Steele,* 147 F.3d at 1317-18. Therefore, the class claim for punitive damages under Alabama law may not be viewed in the aggregate for amount in controversy purposes, but instead must be divided *pro rata* among each class member.

As we have mentioned, *supra* note 5, the individual compensatory damages of each class member appear to be, at most, approximately $1,400. That means in order to satisfy the $75,000 amount in

controversy requirement, each class member would have to recover over $73,000 in punitive damages. For that to be possible, the class, which appears to consist of at least 36,000 members, would have to recover over $2.628 billion in punitive damages. That recovery is not possible as a matter of law, *see generally BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and so, diversity jurisdiction cannot be founded upon the claim for punitive damages.[12]

### 2. *Attorney's Fees*

In the injunctive relief count of their complaint, the plaintiffs also ask the court to award them attorney's fees. Alabama follows the "American Rule," which generally requires each party to pay its own attorney's fees. *See Ex Parte Horn,* 718 So.2d 694, 702 (Ala.1998). And "when there is no direct legal authority for an attorney's fee, a request for a fee [may not] be included in the computation o[f] the jurisdictional amount." *Galt G/S v. JSS Scandinavia,* 142 F.3d 1150, 1155 (9th Cir.1998) (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3712, at 178 (3d ed.1985)).

There is an exception to the "American Rule," and thus, "direct legal authority" supporting inclusion of a claim for attorney's fees in determining the amount in controversy, when an award of fees is authorized either by statute or contract. *See Graham v. Henegar,* 640 F.2d 732, 736 n. 9 (5th Cir.1981) (citations omitted). In this case, the plaintiffs do not claim a statutory or contractual right to attorney's fees. But a clearly established common law basis for awarding attorney's fees may also justify including a reasonable estimate of requested attorney's fees in determining the amount in controversy. *See Ross v. Inter-Ocean Ins. Co.,* 693 F.2d 659, 661 (7th Cir.1982) (noting that a reasonable estimate of attorney's fees may be included in the amount in controversy "where a litigant has a right, based on contract, statute, or other legal authority, to an award of attorney's fees if he prevails in the litigation"); *see also* 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702, at 92-93 & n. 83 (3d. ed.1985).

---

[12]The named plaintiffs state that if class certification is denied, they will proceed in an individual lawsuit, and in such a suit, they may realistically recover an amount of punitive damages, especially when coupled with a recovery of attorney's fees and the value of the requested injunctive relief, that satisfies the amount in controversy requirement. Perhaps, but this suit was filed as a class action and until the class certification is denied, we must treat it as a class action. *See Morrison,* 228 F.3d at 1263 n. 7 (citing 3B J. Moore, *Moore's Federal Practice,* ¶ 23.50 (2d ed. 1985)) ("In the interim between the commencement of the suit as a class action and the court's determination as to whether it may be so maintained it should be treated as a class suit."). If there is no diversity jurisdiction over a putative class action, it is a waste of the resources for both the parties and the court to proceed through a class certification determination on the basis that diversity jurisdiction would exist if the suit had been filed as an individual action. *See University of South Alabama,* 168 F.3d at 410 ("A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings.").

As noted by this Court in *Davis v. Carl Cannon Chevrolet-Olds, Inc.,* 182 F.3d 792 (11th Cir.1999), Alabama recognizes two closely related equitable doctrines providing for an award of attorney's fees: the "common fund" doctrine and the "common benefit" doctrine.[13] *See id.* at 795. Under the common fund doctrine, when litigation generates a fund benefitting a class of individuals, as in a typical class action, the court may award fees to the plaintiff's attorney, usually by deducting a percentage from the fund in order to compensate the plaintiff's attorney. *See Union Fidelity Life Ins. Co. v. McCurdy,* No. 1981387 (Ala. Sept.22, 2000); *see also Edelman & Combs v. Law,* 663 So.2d 957, 958 (Ala.1995) ("[T]his Court, like the federal courts, has long recognized that a lawyer who recovers an award for the benefit of a class of clients is entitled to a reasonable fee from the amount recovered.") (citations omitted). The common benefit doctrine, under Alabama law, allows a court to require the defendant to pay attorney's fees, regardless of whether a fund has been generated by the litigation, when the litigation has "conferred some kind of benefit on the public." *Davis,* 182 F.3d at 795 (citing *Brown v. Alabama,* 565 So.2d 585, 592 (Ala.1990)); *see also Horn,* 718 So.2d at 702 (indicating that fees may be awarded under the common benefit doctrine when "the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff").

In this case, the plaintiffs argue that they will be entitled to an award of attorney's fees under either the common fund doctrine or the common benefit doctrine. In *Davis,* a diversity suit involving Alabama state law, this Court held that a requested award of attorney's fees deducted from the recovery of a common fund could not be viewed in the aggregate to satisfy the amount in controversy requirement for a class action. *See Davis,* 182 F.3d at 796-98. Thus, if the common fund doctrine applies, the estimated amount of attorney's fees in this case, like the claim for punitive damages, must be divided *pro rata* among each class member. Because the amount attributed to each of the more than 36,000 class members would be well below $75,000, the attorney's fee claim under the common fund doctrine is not enough to establish diversity jurisdiction in this case.

We now turn to the issue of whether the plaintiffs would be entitled to attorney's fees under the common benefit doctrine of Alabama and, if so, whether the estimated amount of those fees should be viewed

---

[13]"In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto ... should be followed." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975) (citations and quotations omitted).

in the aggregate for amount in controversy purposes. In their complaint, the plaintiffs allude to the common benefit doctrine as the basis for their attorney's fees claim by requesting "a reasonable attorney's fee for the Plaintiffs for securing relief which will benefit the general public and a large group of persons." According to the plaintiffs, their lawsuit against GTE will produce the type of public benefit for which Alabama courts have awarded attorney's fees under the common benefit doctrine because, they say, their lawsuit will: (1) enjoin GTE's alleged practice of targeting minorities, the elderly, the poor, and similar demographic groups for its deceptive leasing scheme; (2) enjoin unlawful practices affecting all of the residents of communities in which GTE exercises a monopoly on telephone service; and (3) determine if, and to what extent, the APSC has retained the authority to supervise or regulate the CPE activity of telecommunications providers. It follows, according to the plaintiffs, that their suit will result in substantial benefits to a large group of persons, thereby justifying an award of common benefit attorney's fees.

In order to determine whether plaintiffs are correct, it is necessary to trace the origins of the common benefit doctrine and its evolution under Alabama law. The Supreme Court of Alabama first recognized the common benefit doctrine in *Miles v. Bank of Heflin,* 349 So.2d 1072 (1977). There, a group of shareholders brought suit against their corporation seeking an order allowing them to audit the books and records of the corporation. *See id.* at 1073. After holding that the shareholders were so entitled, the Court turned to the question of whether or not to award attorney's fees to the plaintiffs on the grounds that they bestowed a non-pecuniary benefit on the corporation and its other shareholders by bringing suit to enforce shareholder rights. *See id.* at 1076. The Court first noted that there "is no inherent right to have an award of attorney's fees in the absence of contract, statute, or a recognized ground of equity." *Id.* The Court recognized one such equitable ground, holding that the plaintiffs, by bringing suit to enforce the rights of shareholders, could be entitled to reimbursement for expenses incurred in the course of the litigation, but only if they bestowed a substantial benefit on the corporation. *See id. See also Coupounas v. Morad,* 380 So.2d 800, 804 (Ala.1980) (stating, "[i]t is an established rule of law that a minority stockholder is entitled to be awarded a reasonable attorney's fee by the corporation in which he has an interest when a benefit has been conferred upon that corporation by the stockholder's derivative action."). In *Heflin,* the plaintiffs were not reimbursed for their litigation expenses because the Court decided that no such benefit had been conferred by the plaintiffs' suit.

In reaching its conclusion in *Heflin* that the bestowment of a substantial benefit upon the corporation may entitle the plaintiffs to attorney's fees, the Alabama Supreme Court relied primarily on *Mills v. Electric*

*Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Like *Heflin,* the *Mills* case was also a shareholder derivative action. In regards to the fair apportionment of attorney's fees, the Court in *Mills* stated, "[t]he dissemination of misleading proxy solicitations was a deceit practiced on the stockholders as a group, and the expenses of petitioners' lawsuit have been incurred for the benefit of the corporation and the other shareholders." *Id.* at 392, 90 S.Ct. at 625 (internal citations and quotations omitted). The Court concluded that the fact the benefit conferred was non-pecuniary was of no moment, stating, "courts increasingly have recognized that the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders through an award against the corporation, regardless of whether an actual money recovery has been obtained." *Id.* at 394, 90 S.Ct. at 626.

The decisions and opinions in *Heflin* and *Mills* teach that the purpose of the common benefit doctrine is to spread the cost of the litigation, including attorney's fees, among those who have benefitted from the litigation. It is not so much fee-shifting as fee-spreading. This fee-spreading is accomplished, in the case of a corporate defendant in a derivative suit, by assessing costs against the defendant corporation directly, because those costs are, in effect, incurred by the shareholder/beneficiaries. *See Mills,* 396 U.S. at 394-95, 90 S.Ct. at 627 (explaining that the common benefit doctrine is an extension of the common fund doctrine, but that in cases involving the former "there was a 'common fund' only in the sense that the court's jurisdiction over the corporation as a nominal defendant made it possible to assess fees against all of the shareholders through an award against the corporation" ). Fee-spreading in such circumstances comports with the underlying purpose of both the common fund and common benefit doctrines, which "is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefitted from them and that would have had to pay them had it brought the suit." *Id.* at 396-397, 90 S.Ct. at 628. *See also Hall v. Cole,* 412 U.S. 1 n. 7, 7 n. 7, 93 S.Ct. 1943, 1946 n. 7, 36 L.Ed.2d 702 (1973) (noting that rationale underlying the common benefit doctrine represents an extension of the common fund doctrine).

Thus, under the common benefit doctrine, the focus is on the nature of the relationship between the defendant and the class members, or, in the absence of a certified class, those individuals who can be said to benefit from the litigation. If the relationship is such that the costs can be spread indirectly to the beneficiaries by imposing them on the defendant, then the relationship permits application of the doctrine. As explained in *Campbell v. General Motors Corp.,* 19 F.Supp.2d 1260 (N.D.Ala.1998), "[g]enerally, federal courts have carefully hemmed in the common benefit doctrine, applying it only where the fees, though paid

for by the defendant, are somehow distributed over those benefitted by the plaintiffs' actions." *Id.* at 1270 n. 9 (emphasis and citations omitted). As examples, the *Campbell* court cited *Hall,* 412 U.S. at 4-9, 93 S.Ct. at 1945-48, in which the United States Supreme Court permitted an award of attorney's fees against a union defendant where the suit had resulted in non-monetary benefits to the union members, and *Barton v. Drummond Co.,* 636 F.2d 978, 982-85 (5th Cir. Unit B 1981), in which this Court permitted an award of attorney's fees against a corporation when the suit resulted in non-monetary benefits for its stockholders. *See Campbell,* 19 F.Supp.2d at 1270 n. 9; *see also Mills,* 396 U.S. at 396-97, 90 S.Ct. at 628.

Since its decision in *Heflin,* the Alabama Supreme Court has awarded attorney's fees under the common benefit doctrine in the context of only one particular sort of relationship—that of citizens and their governmental entity. *See generally Brown v. State,* 565 So.2d 585, 591-92 (Ala.1990); *Ex Parte Horn,* 718 So.2d 694, 706 (Ala.1998). In such lawsuits, the governmental entity is the defendant and the citizens of that entity are the incidental beneficiaries of the suit. Although federal courts have yet to construe the common benefit doctrine quite so broadly,[14] application of the doctrine to the citizen/government relationship is entirely consistent with its theoretical underpinnings. The relationship of citizens to a governmental entity is such that imposing litigation costs on the defendant, payable from the government's coffers, is, in effect, obtaining those fees from the citizen beneficiaries of the litigation.[15]

Although the Alabama Supreme Court has never explicitly based its common benefit analysis on the nature of the relationship between a defendant and the beneficiaries of the lawsuit, that rationale has clearly animated the court's decisions. For example, in *Ex Parte Horn,* 718 So.2d 694 (Ala.1998), the question was whether the plaintiffs had conferred a sufficiently "public" benefit that it was equitable to impose attorney's fees on the city of Birmingham. The plaintiffs had successfully brought an action preventing the construction of a sanitary waste transfer station adjacent to their neighborhood in the western part of the city. *See Id.* at 704. The city argued that "the facility would have had no impact on residents of eastern Birmingham and,

---

[14]*See Alyeska,* 421 U.S. at 264 n. 39, 95 S.Ct. at 1625 n. 39 (noting that in the Court's previous common benefit cases, application of the doctrine was limited to cases where the benefits of the litigation "could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefitting. In this case however, sophisticated economic analysis would be required to gauge the extent to which the general public, the supposed beneficiary ... would bear the costs.").

[15]That is not to say that the Alabama Supreme Court would only apply the common benefit doctrine to governmental defendants. The relationship between a defendant who is a governmental entity and the citizens who stand to benefit from the lawsuit brought against that defendant is probably not the only type of relationship where application of the common benefit doctrine is appropriate.

thus, ... a benefit was not conferred on all the residents of Birmingham in the same manner as it was conferred on [the plaintiffs]." *Id.* at 704-05. The underlying premise of the city's argument was that the costs of the litigation would be shouldered by all of the Birmingham residents if the city was forced to pay, and that it would be inequitable to impose those costs on the entire city of Birmingham because all of its residents did not benefit equally from the litigation. The Alabama Supreme Court ultimately rejected the city's argument, reasoning that "the plaintiffs' efforts clearly resulted in an increased level of due process protection to all residents of Birmingham ... and all of its residents have received a common benefit...." *Id.* at 706. What matters for purposes of our analysis, though, is that in *Horn* the Alabama Supreme Court accepted the underlying legal premise of the city's argument—application of the common benefit doctrine turns on whether requiring the defendant to pay the plaintiffs' litigation costs would spread those costs equitably among the beneficiaries of the lawsuit.

Returning to the facts of our case, the relationship between GTE and the proposed beneficiaries of this lawsuit does not warrant application of the common benefit doctrine. Imposing on GTE litigation costs, including attorney's fees, would not operate to spread those costs among the purported beneficiaries of the litigation, the class members. Those beneficiaries do not have any apparent economic or other connection with GTE—like shareholders to a corporation, union members to a union or citizens to a governmental entity—that would result in those costs being shared by the class members. Even assuming that this lawsuit will confer a benefit on the general public, requiring GTE to pay attorney's fees under the common benefit doctrine would not serve the doctrine's purpose of spreading the costs of this litigation among those beneficiaries. Instead, it would merely saddle GTE as the unsuccessful defendant with those costs, in clear contravention of the American Rule.

Therefore, we conclude that any award of attorney's fees in this case would be paid out of the common fund created by the litigation and not by GTE on the basis of a common benefit theory. An award of common fund attorney's fees may not be viewed in the aggregate, *see Davis,* 182 F.3d at 796-98, and from that it follows the requested attorney's fees in this case do not establish the requisite amount in controversy for diversity jurisdiction.[16]

---

[16]The plaintiffs in this case have also asserted claims of fraud against GTE. The Alabama Supreme Court has, on one occasion, recognized an exception to the American Rule where "fraud, willful negligence or malice has been practiced." *See Reynolds v. First Alabama Bank of Montgomery, N.A.,* 471 So.2d 1238, 1242-43 (Ala.1985). However, the Alabama courts have apparently not extended the application of *Reynolds* beyond the facts of that case. Notably, the *Reynolds* court emphasized that case

### 3. *Injunctive Relief*

For amount in controversy purposes, "the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted." *Cohen II,* 204 F.3d at 1077 (discussing *Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.,* 120 F.3d 216, 218-20 (11th Cir.1997)). In this case, the plaintiffs seek to enjoin GTE from concealing or misrepresenting its lease charges and to require GTE to notify its customers that failure to pay the lease charges cannot result in termination of telephone service. Essentially, the monetary value of the injunction to the plaintiffs is the present value of the future lease charges that the class members could avoid by being clearly informed of the allegedly excessive cost of those charges and of the fact that continuation of their telephone service is not contingent on paying those charges.

As to any individual class member, that monetary benefit would be well below $75,000. For example, a class member who paid the highest current monthly lease rate for a telephone (about $10) for even as long as sixty years would end up paying only $7,200, and the present value of that amount would be far less. Of course, if the value of the injunction could be aggregated, given the size of the class the injunctive relief sought in this case would satisfy the amount in controversy requirement. But as explained recently in the *Morrison* decision, aggregation depends on the rights asserted by the plaintiffs and not the particular type of relief sought. *See Morrison,* 228 F.3d at 1271.

Aggregation is permissible only when multiple plaintiffs seek to "enforce a single title or right, in which they have a common and undivided interest," *Zahn,* 414 U.S. at 294, 94 S.Ct. at 508, and thus, "when an injunction protects rights that are separate and distinct among the plaintiffs, the value of the injunction to the individual plaintiffs may not be aggregated to sustain diversity jurisdiction." *Morrison,* 228 F.3d at 1271 (citing *Alfonso v. Hillsborough County Aviation Auth.,* 308 F.2d 724 (5th Cir.1962)). In this case, the requested injunction would protect the rights of the class members that arise from their individual lease agreements with GTE. When plaintiffs assert rights that arise from individual contracts with a defendant, those rights are separate and distinct, and thus, their claims may not be aggregated. *See, e.g., Oliver v.*

---

involved fraud on the part of a trustee which caused losses to the individual trusts of the class members, and thus, that the suit was "essentially an equitable proceeding." *Id.* at 1241. Moreover, the plaintiffs have not cited, and this Court has not found, any decision in the fifteen years since *Reynolds* where an Alabama appellate court has shifted attorney's fees to a defendant because it had committed fraud. For these reasons, we conclude that application of the "fraud" exception alluded to in *Reynolds* is too speculative to serve as a basis for including an award of attorney's fees in determining the amount in controversy in this case.

*Alexander,* 31 U.S. (6 Pet.) 143, 145-48, 8 L.Ed. 349 (1832) (joint suit by seamen to collect wages under their individual employment contracts); *Morrison,* 228 F.3d at 1271 (class action involving individual insurance policies); *Alvarez v. Pan American Life Ins. Co.,* 375 F.2d 992, 993 (5th Cir.1967) (same).

The allegations that the lease agreements were induced and maintained by a common scheme of fraud does not change the separate and distinct nature of the rights asserted in this case. *See Eagle Star Ins. Co. v. Maltes,* 313 F.2d 778, 780 n. 4 (5th Cir.1963) ("Federal Rule of Civil Procedure, [R]ule 20 allows the joinder of parties plaintiff when there is a common question of law or fact and the claims of all plaintiffs arose out of the same transaction o[r] occurrence. However, this joinder for convenience of the court affects in no way the entirely separate question of aggregation of claims to satisfy the jurisdictional amount."). The plaintiffs allege that, in those communities where it had a monopoly, GTE took advantage of its monopoly status in order to accomplish its fraudulent scheme, and that its customers were not in a position to individually negotiate their lease agreements. If true, those facts may be relevant to the egregiousness of GTE's alleged fraud, but it remains true that the rights asserted arise from the individual lease agreement of each class member. Part of the relief sought by the plaintiffs is for the court to declare "the lease agreements null and void from their inception."

It is also worth mentioning that since GTE raised the specter of the primary jurisdiction of the APSC, the plaintiffs have insisted that the CPE activity challenged in this case is not part of GTE's public utility service but instead is a free market, non-regulated business. If true, that is a further indication that the rights which would be protected or vindicated by the requested injunction are the separate and distinct rights of the class members in their lease agreements with GTE, and as a result, the value of the injunctive relief may not be aggregated to satisfy the amount in controversy requirement for diversity jurisdiction.

### B. FEDERAL QUESTION JURISDICTION

We turn now to plaintiffs' fallback argument, which is that the district court had federal question jurisdiction over this case, pursuant to 28 U.S.C. § 1331, because this lawsuit seeks injunctive relief based on the FCC's preemption of state regulation of the CPE activity of telecommunications providers. Recall that the plaintiffs seek an injunction to prevent GTE from misrepresenting its telephone lease charges as part of its regulated, telecommunications service and thereby wrongfully implying that it may disconnect a customer's telephone service for failure to pay the lease charges. The plaintiffs also seek a declaration that the lease agreements "are null and void from their inception."

Under the federal question jurisdiction statute, 28 U.S.C. § 1331, a district court has subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Whether a claim arises under federal law for purposes of 28 U.S.C. § 1331 is generally determined by the well-pleaded complaint rule, "which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). A well-pleaded complaint presents a federal question where it "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 27-28, 103 S.Ct. 2840, 2856, 77 L.Ed.2d 420 (1983).

The complaint in this case establishes neither basis for federal question jurisdiction, because it contains only state law causes of action and does not show that any "substantial question of federal law" is necessary for the plaintiffs to obtain their requested relief. *See id.* The question of whether the Alabama Public Service Commission retains some regulatory power over the CPE activity of GTE, or whether such power was preempted, arose not from the complaint but rather from GTE's invocation of the primary jurisdiction doctrine in defense. As the Supreme Court stated in *Franchise Tax Bd.,* federal question jurisdiction exists only when "the *plaintiff*'s complaint establishes that the case 'arises under' federal law." *Id.* at 10, 103 S.Ct. at 2847 (emphasis in original) (" '[A] right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.' ") (citation omitted).

A federal question is presented when a suit "seeks injunctive relief from state regulation[ ] on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail...." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). But the complaint in this case seeks injunctive relief against GTE, not against the regulatory activity of the Public Service Commission. Again, the issue of the Commission's regulatory authority arises only from GTE's defensive assertion of the purported primary or exclusive jurisdiction of the APSC over the plaintiffs' claims.

The plaintiffs argue that their claim for injunctive relief is essentially a federal claim because federal law has completely preempted states' regulation of the CPE market and the claim for injunctive relief is based

on that preemption. "One corollary of the well-pleaded complaint rule ... is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Franchise Tax Bd.,* 463 U.S. at 24, 103 S.Ct. at 2854 ("[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arise under' federal law.").

The Supreme Court has recognized that complete preemption occurs when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430 (citing *Metropolitan Life,* 481 U.S. at 65, 107 S.Ct. at 1547). Under these rare circumstances, "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim." *Id.*

We have noted that "the [Supreme] Court has revisited the complete preemption doctrine only sparingly" and has found complete preemption only in the context of two federal statutes—the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, *et seq.,* and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq. BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 855 (11th Cir.1999). Furthermore, "although the Supreme Court recognizes the existence of the complete preemption doctrine, the Court does so hesitatingly and displays no enthusiasm to extend the doctrine into areas of law beyond the LMRA and ERISA." *Id.* at 856. Similarly, this Court has yet to find complete preemption outside the context of the LMRA and ERISA. *Id.*

In *BLAB,* which is the only Eleventh Circuit case to address directly the application of the complete preemption doctrine outside of the context of the LMRA and ERISA, we discussed the various tests employed by other courts to determine whether complete preemption exists. *See id.* at 856-57 (concluding that the Cable Communications Policy Act did not completely preempt state law). Although we refused to adopt any particular approach, we summarized the various factors considered by other courts as follows:

> These cases reveal a varying emphasis on such questions as whether the state claim is displaced by federal law under an ordinary preemption analysis, whether the federal statute provides a cause of action, what kind of jurisdictional language exists in the federal statute, and what kind of language is present in the legislative history to evince Congress's intentions.

*Id.* at 857. Furthermore, we concluded that the focus of each of the tests was "to determine whether Congress not only intended a given federal statute to provide a federal defense to a state cause of action that could be asserted either in a state or federal court, but also intended to grant a defendant the ability to remove the

adjudication of the cause of action to a federal court by transforming the state cause of action into a federal [one]." *Id.* (citation and quotation omitted).[17] In other words, the "touchstone" of federal jurisdiction under the complete preemption doctrine is "Congress's intent." *Id.*

In light of the factors that we considered in *BLAB,* we are persuaded that the complete preemption doctrine does not provide a basis for federal jurisdiction in this case. The plaintiffs have not shown, and our review has not found, any indication that either Congress or the FCC intended completely to preempt state law in deregulating the CPE activity of telecommunications providers. Therefore, federal question jurisdiction is not present as to the plaintiffs' claim for injunctive relief.

In arguing that we should find complete preemption, the plaintiffs point to FCC orders which expressly preempt some state regulation of CPE activities. However, a review of those orders reveals that complete preemption was not intended. Although the FCC's orders concerning deregulation recognized that preemption of many state regulations would occur, the FCC stated that "we preempt the states here only to the extent that their ... regulation is at odds with the regulatory scheme set forth." In re Amendment of Section 64.702 of the Commission's Rules and Regulations, 84 F.C.C.2d 50, 103 (1980). Similarly, in a subsequent order addressing the deregulation process, the FCC concluded that "[t]he framework we adopt here provides maximum flexibility for states to [deregulate] embedded CPE" and that "it is in the public interest that states be given a substantial role in developing procedures for [deregulation]." Detariffing of Customer Premises Equipment and Enhanced Services, 99 F.C.C.2d at 355, 363 (1984). *See also Computer and Communications Indus. Ass'n v. FCC,* 693 F.2d 198, 205 (D.C.Cir.1982) (noting that "the Commission was careful to limit the area of preemption"). Statements like those are not the language of complete preemption, but are instead inconsistent with it. The FCC did not intend to completely preempt all state laws concerning CPE regulation.

Likewise, a review of the Federal Communications Act, 47 U.S.C. § 151, *et seq.,* pursuant to which

---

[17]The fact that, in *BLAB,* we refer to federal defenses rather than causes of actions, and to "removal" jurisdiction rather than "subject matter" jurisdiction, reflects that the doctrine of complete preemption has generally been considered in the context of a defendant seeking to remove an action that, on its face, only asserts state law claims. In light of our conclusion that the plaintiffs incorrectly relied on diversity jurisdiction as a basis for the district court's subject matter jurisdiction over this action, it is the plaintiffs rather than the defendant who argue that the complete preemption doctrine provides an alternative basis for federal jurisdiction over this action. Nonetheless, the same principles apply in this case as would apply if we were determining the propriety of removal jurisdiction. *See BLAB,* 182 F.3d at 854 (noting that removal jurisdiction is available only where federal courts have original jurisdiction over an action pending in state court).

the FCC was acting in deregulating CPE activity, reveals that Congress also did not intend to preempt completely state causes of action or remedies concerning the subject matter of the Act. In the Communications Act, Congress provided that:

> Any person claiming to be damaged by any common carrier subject to the provisions of [the Communications Act] may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of [the Communications Act], in any district court of the United States of competent jurisdiction....

47 U.S.C. § 207. Despite this provision permitting federal jurisdiction over well-pleaded actions under the Communications Act, Congress further provided that "[n]othing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. As we stated in *BLAB,* the existence of this type of "savings" clause which "contemplate[s] the application of state-law and the exercise of state-court jurisdiction to some degree ... counsels against a conclusion that the purpose behind the ... Act was to replicate the 'unique preemptive force' of the LMRA and ERISA." 182 F.3d at 857-58.

Furthermore, the plaintiffs have not pointed to any provision in the Communications Act itself or in its legislative history which would indicate "that Congress intended state law causes of action within the scope of [the Communications Act] to be federalized." *Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.,* 958 F.Supp. 947, 958 (D.Del.1997) (finding no complete preemption in context of the Communications Act). Therefore, we conclude that the plaintiffs' request for injunctive relief is not subject to the complete preemption exception to the well-pleaded complaint rule. Consequently, the district court had no subject matter jurisdiction over this action.

Although the complete preemption doctrine does not apply in this case, we recognize that use of the term "preemption" in this context has caused "a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption." *BLAB,* 182 F.3d at 854. For that reason, it is worth pointing out that:

> complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court.

*Id.* at 854-55. In other words, our conclusion that the complete preemption doctrine does not provide a basis for federal jurisdiction in this action does not preclude the parties from litigating about the preemptive effect, if any, of the FCC's orders or the Communications Act in any subsequent state court action.

### III. CONCLUSION

Because the district court lacked subject matter jurisdiction over this case, we VACATE its order dismissing the case on abstention grounds and REMAND with directions that the case be dismissed for lack of jurisdiction.

VACATED AND REMANDED.