**THIS DISPOSITION
IS CITABLE
AS PRECEDENT OF
THE TTAB**

Hearing:                                              Mailed:
16 August 2005                                        18 January 2006


**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re America Online, Inc.
_____

Serial Nos. 75460305, 75460306, 75496386, and 75497543
_____

Michael A. Grow of Arent Fox PLLC for America Online, Inc.

Carolyn Pendleton Cataldo, Trademark Examining Attorney, Law Office 103 (Michael Hamilton, Managing Attorney).
_____

Before Hairston, Rogers, and Drost, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On 24 June 2004, the board granted applicant's (America Online, Inc.) motion to consolidate the appeals in these four applications. These applications for registration on the Principal Register all involve the term INSTANT MESSENGER in typed (standard character) form. Basic information about the four applications on appeal is set out below.

I.

Serial No. 75497543
Filing date:  04 June 1998
Mark:  INSTANT MESSENGER
Services:
Class 38:  Telecommunications services, namely, electronic transmission of data, images and documents via computer terminals; electronic mail services; and facsimile transmission
Class 39:  Electronic storage of data and documents
Date of first use (both classes):  14 March 1997
Date of first use in commerce (both):  14 March 1997

II.

Serial No. 75496386
Filing date:  04 June 1998
Mark:  INSTANT MESSENGER
Services:
Class 42:  Computer services, namely, providing multiple user access to computer networks and bulletin boards and the transfer and dissemination of a wide range of information, providing a wide range of general interest information via computer networks
Date of first use:  14 March 1997
Date of first use in commerce:  14 March 1997

III.

Serial No. 75460305
Filing date:  01 April 1998
Mark:  AOL INSTANT MESSENGER
Services:
Class 38:  Telecommunications services, namely, electronic transmission of data, images and documents via computer terminals; electronic mail services; and facsimile transmission
Class 39:  Electronic storage of data and documents
Date of first use (both classes):  14 March 1997
Date of first use in commerce (both):  14 March 1997

IV.

Serial No. 75460306
Filing date:  01 April 1998
Mark:  AOL INSTANT MESSENGER
Services:
Class 42:  Computer services, namely, providing multiple user access to computer networks and

> bulletin boards for the transfer and dissemination of a wide range of information, providing a wide range of general interest information via computer networks
> Date of first use:  14 March 1997
> Date of first use in commerce:  14 March 1997

Issues

The issues in all four cases are basically the same:

1. Is the term INSTANT MESSENGER a generic term for the identified services?

2. Is the term INSTANT MESSENGER merely descriptive when used in association with the identified services?

3. If the term INSTANT MESSENGER is merely descriptive, has applicant demonstrated that the mark has acquired distinctiveness under Section 2(f) of the Trademark Act?

Obviously, the question in Serial Nos. 75460305 and 75460306 is whether the term INSTANT MESSENGER must be disclaimed under the provision of Section 6 of the Trademark Act.  We add that, inasmuch as neither the examining attorney nor applicant raised arguments specifically attributed to the different classes in the applications, we will not separately address each class of services.  When we refer to the record, which is largely the same in the four cases, file references will be to the file in Serial No. 75497543, unless we indicate otherwise.

Background

After many years of prosecution, the evidence in these applications is quite extensive. We begin by discussing the examining attorney's evidence that the mark is generic. This evidence is also relevant to the other issues of descriptiveness and acquired distinctiveness. The examining attorney has included numerous examples from the NEXIS database and the Internet regarding uses of the term INSTANT MESSENGER. These uses fall into several categories. Some appear to be generic uses of the term INSTANT MESSENGER for similar services, as the examples below indicate.

> Nowadays, thoughts are conveyed electronically through instant messengers and cell phones.
> *Macon Telegraph*, 14 December 2001.
>
> Drop superfluous programs, such as instant messengers and screen savers, that run in the background and suck up system resources
> *Washington Post*, 13 December 2001.
>
> Giving computer makers much flexibility to configure versions of Windows operating system with applications – such as Web browsers, instant messengers and streaming media players.
> *Washington Post*, 18 August 2001.
>
> You have three E-mail accounts, two instant messengers on your PC, a pager, a cell phone, an answering machine and voice mail.
> *Orange County Register*, 26 April 1998.
>
> Fortunately, users can limit their availability to instant messaging by setting up lists of authorized instant messengers.

*InformationWeek*, 31 May 1999.

The Internet offers a variety of communication channels:  e-mail, instant messengers, Web greeting cards.
*Press Journal (Vero Beach, FL)*, 06 September 1999.

The more programs that are used involving the Internet – personal finance software that electronically interacts with a local bank or an instant messenger program, for example – the more ports that open up on a computer.
*The Plain Dealer*, 06 August 2001.

Improvements include an instant-messenger application, the ability to beam data to and from PDAs running Palm Inc.'s Palm OS, and Bluetooth support.
*InfoWorld Daily News*, 06 December 2001.

Evans students said they use e-mail, instant messenger programs and chat rooms as many as five or six hours a day.
*Augusta Chronicle*, 04 December 2001.

WordPerfect, Lotus WordPro, 1-2-3, Approach, Organizer, instant messengers and e-mail clients.
*Information Security*, December 2001.

Additionally, an instant messenger feature at each booth will allow entrepreneurs to exchange questions and answers privately.
*Tulsa World*, 24 October 2001.

People in far-flung countries are chatting via instant messenger software, posting thoughts on electronic bulletin boards, and searching for relevant Web journals at sites.
*Washington Post*, 04 October 2001.

The Internet stood out in the area of personal communication with instant messenger services and e-mail leading the way.
*Las Vegas Review-Journal*, 17 September 2001.

The whole project has been through e-mail and instant messenger.
*The Ledger (Lakeland, FL),* 29 December 1998.

Other examples appear to use the term in association with similar services but these services are apparently provided by competitors:

At Yahoo, alerts are also available via instant messenger, though it doesn't always work properly.
*Chicago Tribune*, 03 December 2001.

Yahoo! promotes LogiTech's QuickCam Web cams as a way to use video capabilities of Yahoo!'s instant messenger service.
*ASAP*, 01 December 2001.

Yahoo added video chats to its instant messenger program in June.
*San Francisco Chronicle*, 26 September 2001.

Expedia's involvement is in the part of the XP platform Windows Messenger that used to be known as Instant Messenger.
*Computing*, 25 October 2001.

Also bundled for the first time is Microsoft's Instant Messenger software.
*Computing*, 11 October 2001.

The two together could provide a powerful combination, and with the use of Microsoft client interfaces – Office XP, Microsoft Instant Messenger or a Web browser.
*Network World*, 08 October 2001.

That's the audio and video conferencing software integrated into Microsoft's instant messenger.
*Investor's Business Daily*, 21 September 2001.

Microsoft's Instant Messenger product was hit by an embarrassing glitch last week.
*Computing*, 12 July 2001.

Microsoft Corp. said it will use technology from Net2Phone in a new version of its instant messenger e-mail software available this week.
*The Record (Bergen County, NJ)*, 21 July 2000.

> Microsoft Corp. said it will use technology from
> Net2Phone in a new version of its instant messenger e-
> mail software that enables Internet users to make
> long-distance calls.
> *St. Petersburg Times*, 21 July 2001.

Still other uses are equivocal because it is not clear whether the term is being used as a generic term or as a reference to applicant's services, perhaps without capitalizing the initial letter of the words:

> When there was a break in the action, he sent love
> notes to his wife, Rachel, by instant messenger.
> *New York Times*, 13 December 2001.

> As soon as I get back to my dorm from class, I turn on
> my instant messenger.
> *Dayton Daily News*, 11 December 2001.

> She also suggested he turn off the instant messenger
> when she is writing her English essays.
> *Hartford Courant*, 06 December 2001.

> The man from the home of the recently sunken Seattle
> Mariners went online in Starbucks with Ed Koch,
> talking to Starbucks boss Howard Schultz live by
> Instant Messenger video phone.
> *New York Post*, 26 October 2001.

> VeeAreCity.com will offer news, weather, sports,
> financial information and Instant Messenger and other
> Internet services.
> *Broward Daily Business Review*, 29 November 1999.

> Without the Instant Messenger program, my kids stopped
> fighting over the computer.
> *Sacramento Bee*, 10 November 1999.

Other uses appear to be references to applicant or its licensees:

> AOLes
> (n) people who spend their whole lives talking on
> Instant Messenger.
> *Management Today*, 31 July 2001.
>
> Aim Adjuster, a program that removes the
> advertisements from American Online's Instant
> Messenger client.
> *Houston Chronicle*, 22 October 1999.
>
> I was on the instant messenger and my "you've got
> mail" thing came up.
> *San Jose Mercury News*, 05 December 2001.

We also add that there is evidence that "instant messaging" is a generic term used in association with applicant's services:

> The instant messaging world is dominated by four
> platforms:  Microsoft's MSN Messenger, AOL Instant
> Messenger (AIM), Yahoo! Messenger and ICQ (also owned
> by AOL).
> *Computing*, 22 June 2002.
>
> But providers of instant messaging have not been able
> to turn their millions into profits.
> *New York Times*, 17 June 2002.
>
> For more information on instant messaging programs,
> visit…
> *Lexington-Herald Leader*, 18 August 2003.
>
> Indeed, instant messaging is a security disaster
> waiting to happen, so you should take precautions to
> make sure your chat app. is as safe and secure as
> possible.
> www.cnet.com.

Applicant responded to the examining attorney's evidence by presenting various types of evidence in support of its position that its mark is not generic or descriptive and that it had acquired secondary meaning.

8

According to applicant's general counsel, Paul T. Cappuccio (pp. 2-3), applicant began using the marks in 1997. "As early as May of 1997, applicant had 8 million customers. At present [2000] there are over 80 million users." These customers use applicant's INSTANT MESSENGER services to send approximately one billion messages each day. The declarant claimed that applicant "spent a substantial amount of money promoting the mark INSTANT MESSENGER and the accompanying services. The amount of money spent on promoting this mark is difficult to estimate given that many of the promotions are done in conjunction with the promotion of Applicant's other products [and] services. Samples of promotional materials … are found all over the Internet bearing Applicant's mark."

Applicant's Vice-President of Brand Marketing, Eddie Leonard, has submitted a declaration dated November 20, 2001 (p. 2) that provided evidence that applicant's "INSTANT MESSENGER service had over 125 million registered users" and applicant's webpage at "'www.aol.com,' which provides a link to the INSTANT MESSENGER service and which displays the mark INSTANT MESSENGER, receives over 28 million hits per day."

In a declaration dated 15 February 2001, applicant's senior vice-president and general counsel (Randall Boe)

9

reported (p. 2) that applicant had licensed its INSTANT MESSENGER mark to Earthlink, Lycos, Juno and others and that these licensees agreed "not to do anything which may adversely affect the validity or enforceability of the mark." The declarant also described one example of its advertising efforts. In that one case, "over 60 million copies of just one direct mail piece alone were sent out with a prominent display of the mark INSTANT MESSENGER."

Applicant also attached approximately twenty declarations from users who state that they "recognize the mark INSTANT MESSENGER as identifying the service coming from America Online as opposed to other companies, and I recognize that the mark INSTANT MESSENGER indicates America Online is the source of the real time communications service branded as INSTANT MESSENGER service."

Applicant also performed a search of the NEXIS News Group File for articles dated 15 June 2002 through 30 June 2002 for the term INSTANT MESSENGER. According to applicant (Henry declaration at 1), 70 articles were found. Of these, 43 "correctly display INSTANT MESSENGER as a trademark and in virtually all instances specifically identify Applicant as the source of the services offered under the mark." Henry declaration at 2. Applicant also discounts 20 articles because they involve articles showing

10

trademark infringement, duplicate articles, and foreign articles. In effect, applicant concluded, the majority of the articles refer to applicant. Applicant also submitted numerous copies of third-party trademark registrations that show the terms "instant" or "messenger" registered on the Principal Register without a disclaimer or an indication that the mark was registered under the provision of Section 2(f).

## Arguments

The examining attorney argues (Brief, p. 11) that the "wording INSTANT MESSENGER has become the means by which consumers refer to real-time Internet communications services… The wording is generic because it is commonly used by relevant consumers to describe the type of services specifically offered by the applicant." Furthermore, the examining attorney maintains that applicant's "computer services, namely email and chatrooms, are 'instant messenger' services that enable users to receive messages instantly from people who are included on their 'buddy' lists. The wording INSTANT MESSENGER, therefore, merely describes a feature of the applicant's services." Brief at 6. Regarding the question of acquired distinctiveness, the examining attorney maintains that "'Instant Messenger' is

11

generic, and therefore, not registrable under Section 2(f)." Brief at 12.

On the other hand, applicant argues that consumers, licensees, and third parties recognize applicant's rights in the mark INSTANT MESSENGER. Applicant also submitted numerous examples of its attempts to police its mark, and it has provided responses from entities that were cited by the examining attorney as examples of generic use of the term Instant Messenger. Applicant asserts that "these third parties and publishers, including many of those cited by the PTO, have acknowledged their mistakes or have agreed to use Applicant's INSTANT MESSENGER mark properly in the future." Brief at 16. Applicant argues that many of the examples "may show infringement or unauthorized use of Applicant's mark by competitors" while others "may reflect misuse or misunderstanding on the part of reporters writing about unrelated third parties." Brief at 20. Furthermore, applicant maintains that because "applicant's mark INSTANT MESSENGER does not immediately call to the minds of consumers the specific services provided under the mark, the mark is suggestive rather than generic as applied to such services." Brief at 17. Finally, applicant argues that the "first section of the PTO Brief alleges that the mark is merely descriptive. However, there is no

12

allegation that the secondary meaning evidence offered by Applicant is inadequate.  Thus, if the Board finds the mark merely descriptive, the subject application should be approved for publication."  Reply Brief at 4.

### Genericness

The first issue we must address is whether the term INSTANT MESSENGER is generic for applicant's services.

The Court of Appeals for the Federal Circuit has held that:  "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question."  H. Marvin Ginn Corp. v. Int'l Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986).  Marvin Ginn goes on to explain that:

> Determining whether a mark is generic therefore involves a two-step inquiry:  First, what is the genus of goods or services at issue?  Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?

> Id.

When we view the examining attorney's evidence, it is clear why applicant's marks were refused registration on the ground that the marks were generic.  Numerous references in a wide variety of publications over a number

13

of years show use of the term "Instant Messenger" to refer to services related to providing real time text messages. Such excerpts as "thoughts are conveyed electronically through instant messengers and cell phones" and "[d]rop superfluous programs, such as instant messengers and screen savers" clearly show generic use of the term. These references convince us that the examining attorney has met her initial burden of setting forth a prima facie case that the term INSTANT MESSENGER is generic for the services identified in applicant's applications.

We must now consider whether applicant has rebutted the examining attorney's prima facie case of genericness. To respond to this evidence, applicant has submitted its own NEXIS evidence that attempts to show a snapshot of NEXIS printouts during a set period (15-30 June 2002). When we view this "snapshot," regardless of whether we consider the total number of stories or if we exclude the alleged infringers, we must nonetheless conclude that the majority of the articles refer to applicant. Moreover, applicant has shown that it has engaged in substantial marketing of its services under this mark. Just one mailing of its advertisement involved 60 million copies. In effect, the one mailing would have been distributed to a significant percentage of the total population of America.

14

Furthermore, applicant has 80 million users of its identified services. Its services deliver more than one billion messages every day. More mundanely, applicant has submitted affidavits from several of its customers that demonstrate recognition of applicant's term as a source indicator and show that numerous corporations have either acknowledged applicant's term as a trademark or are licensees of applicant.

While the examining attorney has submitted significant evidence to support the genericness refusal, applicant's response is impressive. The Federal Circuit has addressed a similar case where there was a mixed record on the question of genericness. "The mixture of usages unearthed by the NEXIS computerized retrieval service does not show, by clear evidence, that the financial community views and uses the term CASH MANAGEMENT ACCOUNT as a generic, common descriptive term for the brokerage services to which Merrill Lynch first applied the term." In re Merrill Lynch, Pierce, Fenner and Smith Inc., 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987) (footnote omitted). We add that the mere fact that a record includes evidence of both proper trademark use and generic use does not necessarily create a mixed record that would overcome an examining attorney's evidence of genericness. Quite

15

simply, it would be fairly easy for a well-heeled applicant to ensure that there were at least some stories that would properly use an applicant's mark. However, in this case, the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition by customers, publishers, and third parties.

We add that this case is distinguishable from Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 39 USPQ 296 (1938). In that case, the Court found that "since 1894 the article has been known to the public as shredded wheat. For many years, there was no attempt to use the term 'Shredded Wheat' as a trade mark." 39 USPQ at 298-99. In the present case, we cannot conclude that the identified services have been known to the public as "Instant Messenger" or that applicant did not attempt to use this term as a trademark.

In light of the evidence of record, we cannot conclude that there is clear evidence that "members of the relevant public primarily use or understand the term sought to be protected to refer to the genus" of the services. Therefore, the refusal on the ground of genericness is reversed.

16

Descriptiveness

The next question we address is whether applicant's mark is primarily merely descriptive when applied to applicant's services.

> A mark is merely descriptive if it immediately conveys information concerning a quality or characteristic of the product or service. [In re Nett Designs, 236 F.3d 1297, 1341, 57 USPQ2d 1564 (Fed. Cir. 1999)]. The perception of the relevant purchasing public sets the standard for determining descriptiveness. *Id*. Thus, a mark is merely descriptive if the ultimate consumers immediately associate it with a quality or characteristic of the product or service. On the other hand, "if a mark requires imagination, thought, and perception to arrive at the qualities or characteristics of the goods [or services], then the mark is suggestive." *Id*.

In re MBNA America Bank N.A., 340 F.3d 1328, 67 USPQ2d 1778, 1780 (Fed. Cir. 2003).

Another important factor is that, when we consider the mark, we must consider it in relationship to applicant's services. In re Abcor Development Corp., 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978) ("Appellant's abstract test is deficient – not only in denying consideration of evidence of the advertising materials directed to its goods, but in failing to require consideration of its mark 'when applied to the goods' as required by statute"). Therefore, applicant's argument that its marks do "not immediately call to the minds of consumers the specific services provided under the mark" (Brief at 17) is not relevant.

In this case, there is evidence that consumers would understand the term "instant messaging" as the generic term to refer to services that are of the type identified by applicant. See, e.g., *Computing*, 22 June 2002 ("The instant messaging world is dominated by four platforms") and *New York Times*, 17 June 2002 ("providers of instant messaging"). The *High-Tech Dictionary* entry made of record by the examining attorney defines "instant messaging" as "A live chat and email service that enables you to find your friends when they are on line and send messages or talk via a private chat room. Each user has a private list of instant messaging addresses and the instant messaging system can be set to alert you when someone on your list is online. You can leave an email message for a user who is not available online." Another article describes "instant messaging" as follows:

> Instant messages appear on a recipient's computer screen almost as soon as they are sent and allow "real-time" typed communication among people who are on the Internet. To trade instant messages, though, both sender and recipient typically have to use the same software.
> *Washington Post*, 19 November 1999.

The term "messenger" is used to describe software that sends "messages." For example, in response to a letter from applicant's counsel, one respondent replied that: "We received your letter complaining about the use of the name

Instant messenger on our websites and promotion material. We apologize [f]or this matter and changed the language wherever we were able to … either just 'messenger' (like MSN, Yahoo etc) or better Dateparty Messenger." Email from Ronald Stevens dated 10 December 2002. An article in *CNET* dated 10 May 2002 refers to: "Virus writers have already shown us that they know a thing or two about exploiting messengers." See also www.highwired.com ("[T]he messenger will stay open until you close it, even if you navigate away from HighWired"); *CNet* 01 March 2000 ("CMGI's iCast unveils messenger that trades video, music").

Applicant points to numerous registrations that the Office has issued for various marks that contain either the term "instant" or "messenger" as evidence that its term INSTANT MESSENGER is not merely descriptive. In these registrations, the marks are registered on the Principal Register without a disclaimer of the term or an indication that the registration is under the provision of Section 2(f). In response to applicant's argument, we note that even "if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court." In re Nett Designs Inc., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). More specifically in this

19

case, there is ample evidence to support a conclusion that "Instant Messaging" is a generic term for the identified services. There is also evidence that "messenger" is understood by prospective purchasers or users as a term that describes the software or program involved in providing "instant messaging." Thus, prospective purchasers or users encountering the term "Instant Messenger" used in association with applicant's services would immediately understand that applicant's services involve the sending, storing, and displaying of messages sent by instant messaging services. Therefore, we conclude that the term "Instant Messenger" would immediately describe the function of the identified services, and the examining attorney's refusal to register the mark on the ground of mere descriptiveness is affirmed.

Acquired Distinctiveness

Lastly, we must consider whether applicant's mark, which we have found to be merely descriptive, is registrable on the Principal Register because it has acquired distinctiveness under the provision of Section 2(f) of the Trademark Act. Here, applicant has the burden of proving that its mark has acquired distinctiveness. In re Hollywood Brands, Inc., 214 F.2d 139, 102 USPQ 294, 295 (CCPA 1954)("[T]here is no doubt that Congress intended

that the burden of proof [under Section 2(f)] should rest upon the applicant"). "[L]ogically that standard becomes more difficult as the mark's descriptiveness increases." Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988).

The examining attorney has not seriously questioned applicant's assertion that its marks have acquired distinctiveness but instead relies primarily on the argument that a generic term can never acquire distinctiveness. See Brief at 12 ("'Instant Messenger' is generic, and therefore, not registrable under Section 2(f) Acquired Distinctiveness"). At this point, we refer to some of the evidence we discussed in our genericness discussion. To summarize, applicant has 80 million users who send approximately one billion messages each day on applicant's identified services. There are millions of visitors to its website each day where the mark is displayed. It has licensed many corporations to use its services identified by the term INSTANT MESSENGER. Its advertising has reached a significant percentage of people in the United States and it has provided some affidavits from customers who recognize its term as a mark for applicant's services. Therefore, applicant has met its burden of showing that its term INSTANT MESSENGER has

21

acquired distinctiveness and the examining attorney's refusal to register under Section 2(e)(1) is reversed.

DECISION: The refusals to register applicant's INSTANT MESSENGER marks (Serial Nos. 75497543 and 75496386) on the ground that the marks are generic, or because applicant must disclaim the generic term INSTANT MESSENGER (Serial Nos. 75460305 and 75460306) are reversed. The examining attorney's refusal to permit registration of applicant's marks under Section 2(f) is, likewise, reversed. The applications will be published for opposition with a notation of applicant's claim under the provision of Section 2(f) of the Trademark Act.